Scott, J.
It is claimed by Goshen township, that the sub scription to the stock of the railroad company made by her trustees, on her behalf, was so made without authority of law. That said trustees had no power, by the terms of the statute, to bind her, by a subscription made under the circumstances and state of facts, appearing in this case. And this allegation of a want of power is based upon severalgrounds, each of which it becomes necessary to consider.
It is claimed that, under the statute, no action could be taken by a township to authorize a subscription, nor any subscription be made on its behalf, until the county had first refused, by the vote of its electors, to authorize á county subscription; and that as no such county vote was ever taken in this case, there could be no authority for a subscription by the township.
The consideration of this objection involves a construction of the statutes, and parts of statutes, which authorize and regulate township subscriptions to the stock of this railroad company. These statutes have come under our consideration, in several previous cases; and it must be confessed that their proper construction is by no means free from difficulty and doubt. Such construction should, if possible, be consistent with both their letter and spirit — should give* effect to the several parts, and make the whole_ harmonize, in subserviency to a common policy.
It is easy to perceive that the general purpose and intent of the acts in question, was to encourage and facilitate the construction of what were regarded as important public improvements, in which whole communities were deeply interested, and through which the material prosperity of the state was expected to be advanced. This object was sought to be accomplished by authorizing subscriptions to the stock of certain companies, incorporated and organized for the purpose of constructing such improvements, by counties and townships, to which their locality might render them objects of peculiar interest.
The act of February 28, 1846, directed that whenever the commissioners of any county should be thereafter authorized *576 to subscribe to the capital stock of any railroad . . . company in this state, it should be the duty of such commissioners to give notice, by advertisement, etc., to the qualified voters of such county, to vote at the next annual election, to be held in their several townships and wards, for or against the proposed subscription; and it was further enacted, that if a majority of the electors, voting as aforesaid, should be in favor of subscription, then such authorized subscription might be made, but not otherwise. (S. & C. 275, note.)
The act incorporating the Springfield and Mansfield Railroad Company was passed March 21, 1850 (48 O. L. 294); the 4th section of which authorized the commissioners of any county through which said railroad might be located, to subscribe to its capital stock, any sum not exceeding fifty thousand dollars.
The 5th section provided as follows: “ If the county commissioners of any county, through which said road shall pass, shall not be authorized by the vote of said county, to subscribe stock to said road, the trustees of any township, through which said road may be located, shall be, and they are hereby, authorized to subscribe any sum of money, not exceeding fifty thousand dollars, to the capital stock of said company,, and provide for the payment of said stock in the same manner that the county commissioners aforesaid are authorized; provided, that the total amount which may be subscribed to the capital stock of said company, by any county and the townships therein, on the line of said road, shall not exceed one hundred thousand dollars.”
The 6th section prohibited a subscription, by either the commissioners of a county, or the trustees of a township, until a vote of the qualified electors of the county or township had been declared in favor thereof, in the manner pointed out by the act of 1846.
No action was taken by the commissioners of Champaign county, through which the railroad was located, to obtain the vote of the electors of said county, on the,question of subscription, at the annual election in 1850, nor was any such vote, in fact, polled.
On the 25th March, 1851, a further act was passed by the *577 legislature, “ to authorize special elections to decide the question of subscription to the Springfield and Mansfield Railroad, by counties and townships.” (49 O. L. 548.) This act was as follows:
“ Sec. 1. That the county commissioners of the several counties through or into which the Springfield and Mansfield Railroad shall be located, are hereby authorized to cause the question of subscription to the capital stock of said railroad by county commissioners, provided for in the act to -incorporate said company, passed March 21,1850, to be submitted to the qualified voters of their respective counties, at a special election, to be by them called for that purpose, at any time hereafter, having first given twenty days’ previous notice.
“ Sec. 2. If the commissioners of any of the counties aforesaid shall not be authorized, by the vote as aforesaid, to subscribe to the capital stock of said company, on behalf of their respective counties, then, and in that case, the question of subscription by township trustees, provided for in the said act incorporating said railroad company, shall be submitted to the people of the respective townships, at a special election, to be called as provided for in the first section of this act.
“ Sec. 3. That said elections shall be conducted, in all respects, in the same manner provided for in said act incorporating said railroad company, except as herein modified by this act.”
A partial construction was given to these several statutes, in Hopple v. Brown Township, 13 Ohio St. Rep. 311; where it was held, that after a subscription had been made to the stock of this railroad by a county, pursuant to the vote of the electors thereof, at a special election, called and held under the act of 1851, in the month of July of that year, no subscription, by a township of the same county, could be authorized by a vote of its electors, at a special election, held therein, prior to the next annual election. And, upon this single ground, the decision in that case rested. But the question now presented is, whether a township subscription might not be authorized, by a vote of its electors, at the time of the annual election in 1851, no previous county vote having author *578 ized a subscription by the county commissioners, and no such county vote having been ordered or taken.
Neither the charter of the railroad company, nor the act c£ 1851, required, in express terms, a previous vote of the electors of the county adverse to subscription, as a condition precedent to the grant of power conferred on the trustees of townships. The letter of the statute restricts the authority given to township trustees, not to cases in which a' subscription by the county commissioners has been prohibited by a county vote, but only to cases in which a county subscription “ shall not be authorized,” by such vote. And, in the present case, a subscription on behalf of Champaign county has never been authorized by the, vote of its electors. We do not think that the expressions in these statutes, “shall not be authorized by the vote of said county” and “shall not be authorized by the vote as aforesaid,” necessarily import, as is claimed by counsel, that a county vote, adverse to subscription, must have been actually polled, before action could be taken on the question by a township. The phrases, “ by the vote of said county,” and “by the vote as aforesaid,” qualify the verb immediately preceding them, and were evidently intended to point out, with precision, the kind of authority intended by the word ■“authorized.” It was necessary to do so, inasmuch as the general legislative grant of power to subscribe, and a popular vote in favor of subscription, had each been spoken of, in the ■statute, as an authorizing of subscription. The phrases in question were intended to show, that the latter kind of authority, and not the legislative grant of power, was referred to, and we think it would he unsafe to assume that they were intended to imply more.
But the powers and franchises of corporations are not to be ■extended by the letter, beyond the obvious spirit and meaning, ■of the statute which confers them. We are, therefore, to ascertain the spirit and meaning of these'statutes.
The language of the proviso in the fifth section of the railroad company’s charter, would seem to imply that stock subscriptions might be made both by a county and townships therein. But that proviso purports to be nothing more than *579 a limitation upon the power previously granted. And though, as a part of the act, it may properly be considered, in giving a construction to other portions of the same act, yet the grant of power must be found elsewhere, or be held not to exist.
Whether the acts in question can be so construed as to admit, in any case, of subscriptions both by a county and townships therein, or are not to be so construed, so much effect may, at least, be given to this proviso, as to prohibit subscriptions by the townships of any county, to an amount exceeding one hundred thousand dollars. Looking, then, to those portions of the several acts which directly confer power, we find, as was held in Hopple v. Brown Township, before referred to, that after the power of subscribing conferred upon a county, has been exercised, no township therein is authorized to exercise a like power. And it is equally clear, that subscriptions by townships, on the line of the road, were intended to be authorized, at the option of the voters therein, in all cases where their respective counties might decline or refuse to exercise the similar power conferred upon them. And as the apparent intention was not to subject the taxpayers of a township to the double imposition of taxes, consequent on subscription by both county and township, we may assume that the opportunity of passing upon, and determining the question of subscription, was intended to be first afforded to counties. But, in determining this question of a county subscription, a. very large discretion was given to the commissioners. They were authorized to subscribe any amount not exceeding fifty thousand dollars. There was no minimum limit. The amount of subscription to be proposed -for the sanction of the vote of the electors, might be as small as the commissioners might think proper to make it, and if the proposition should receive the sanction of the electoral vote, the commissioners might still decline to subscribe. The sanction of a popular vote was a condition precedent to the exercise of the power conferred on the commissioners, but did not otherwise control their discretion. The language of the statute is “ such authorized subscription may be made, but not otherwise.” Having such absolute negative control over the subject, if the commissioners *580 were adverse to subscription, it would be a vain thing to order a vote of the electors on the question, and the law would not require them to do so. But while they might, in their discretion, determine against a county subscription, and might, therefore, well refuse to incur the useless expense and trouble of% submitting the question to the electors of their county, could they thereby, indefinitely, prevent subscriptions from being made by townships on the line of the road, within the county? We think, clearly not. Such a construction would defeat the manifest intention of the statute, which contemplates and authorizes the submission of the question to townships,' when subscription on behalf of the county is refused. However strict a construction it may be proper to give, in favor of the public, to statutes conferring corporate powers and franchises, yet no just policy can require the manifest purpose and general intent of the statute to be defeated, by a construction not absolutely demanded by unequivocal terms. Moran v. Comm. of Miami Co., 2 Black’s (U. S.) Rep. 722.
As we understand the act of 1850, incorporating this railroad company, in connection with the act of 1846, to which it refers, it was the duty of the commissioners of Champaign county, if they judged it expedient that their county should subscribe to the capital stock of the company, to have submitted the question of subscription to the voters of the county, at the next annual election, to be held in the several townships of the county, after giving twenty days’ previous notice. This could not have been done until the second Tuesday of October, 1850; for, the annual township elections, held on the first Monday of April, 1850, occurred within twenty days from the passage of the act. But the commissioners declined to avail themselves of the authority conferred upon them, and, therefore, did not submit the question to a vote, at the time provided by statute. This neglect and refusal of the commissioners, was as efficacious as an adverse voté of the electors, in precluding the possibility of a subscription on behalf of the county; and, "thereupon, the authority conferred by the act upon township trustees, became vested in them, and they might properly have submitted the question of subscription to the *581 electors of their townships, at the April elections, m 1851. Bnt, in the meantime, the act of March 25,1851, was passed, which, without repealing the prior act of 1850, so far modified its provisions, as to renew the power of subscribing to the company’s stock, by county commissioners, by authorizing the question to be submitted to the voters of the county, at a special election, which might be called, “ at any time thereafter,” upon twenty days’ previous notice; and, in like manner, authorizing special township elections on the subject to be held, at any time, upon like notice. Assuming that a county was entitled to pass upon the question of subscription, before the same question could be submitted to the townships therein, the effect of this last statute would be to prevent action on the subject, by a township, at the April elections in 1851. Had the commissioners of Champaign county desired to avail themselves of the authority thus renewedly conferred, it was their duty, within a reasonable time, to call an election and submit the question to the voters of the county; otherwise, the intention of the statute would be defeated, by refusing subscription on behalf of the county, and at the same time denying to the townships the power of taking action on the question.
The trustees of *Goshen township waited, for more than six months, after the passage of the act of March, 1851, and still the county commissioners neglected and declined to call an election under the act, or to manifest any intention or desire to exercise the authority conferred upon them. We think the trustees were justified, under these circumstances, in assuming that the county, through its commissioners, refused to subscribe. And there is no room to claim that this presumption was in fact false, for it is not claimed that any election has ever been ordered by the commissioners on the subject.
Whether we look, then, to .the act of 1850, or that of 1851, we think the trustees of Goshen township were fairly authorized to submit the question of subscription to the voters of that township, rt the annual election in October, 1851.
There is no force in the objection that the act of 1851 only authorized special elections, and that a special election could not be held on the day of the annual election. The vote on *582 this question, whenever taken, was necessarily special in its character; it was authorized by no general election law, and was for a special purpose. The act authorized it to be held at any time, excluding no day by its terms, and no secular day by its spirit. Besides, the act of 1846 had specially required that the vote should be taken at an annual election, and the act of 1850 was in conformity therewith; the object, no doubt, being to secure a full vote of the electors; and the evident intention of the act of 1851 was to dispense with this requirement, and permit the election to be held at any time We think, therefore, that both the letter and spirit of the acts of 1850, and of 1851, authorized the trustees of Groshen township to submit-the question of subscription to the electors of said township, at the time when they did so; and that the Vote of a majority of said electors in favor of a subscription of $15,000, would invest the trustees with full power, under the statute, to subscribe accordingly, in behalf of the township.
But it is further said, that the vote of the electors authorized a conditional subscription only; that the subscription, in fact, was conditional; and that the conditions of the subscription were different from those voted for; and for each of these reasons, it is claimed that the bonds issued in payment-are void.
The power to subscribe, on behalf of the township, was, by the statute, given to the trustees. It was competent for the electors, by their vote, to determine whether this power should be exercised by the trustees, in subscribing any proposed amount, not exceeding fifty thousand dollars.. They might authorize a subscription to a specified extent, but here their power of control ceased. So far as discretion might legally be exercised, in affixing conditions to the subscription, or in determining the terms and conditions of the bonds to be issued, that discretion was given to the trustees, and required for its exercise no preliminary popular vote. Still, the fact that the trustees consulted the judgment of the voters of their township, in respect to matters within their own power of control, and obtained their approval of the contemplated mode of pay *583 ment, and the terms of the bonds proposed to be issued, could not,'of itself, vitiate or impair the authority, which the vote in favor of subscription perfected. If the trustees acted in bad faith, or if they secured a majority vote by misrepresenting, either through mistake or fraud, the mode in which their power was to be exercised, it might have the effect to render the subscription voidable, but nothing more. Such an irregu larity or impropriety might well be waived by subsequent acquiescence.
The subscription which was in fact made, was not, properly speaking, a conditional one; that is to say, it contained no terms which were in the nature of conditions precedent to its taking effect as a subscription. The only formal acts by which the assent of the trustees to a subscription was evidenced, are the entry of an unconditional resolution of subscription in the record of their proceedings, and the issuing of bonds in payment therefor, containing a declaration that they are issued in payment of such subscription. To the obligatory part of each bond is appended a stipulation, reserving to the township the right to require the railroad company thereafter, upon six months’ notice, to take the stock so subscribed by the township, and redeem the bonds so issued. W ould such a contract render both subscription and bonds wholly void? We think, clearly not. The subscription was absolute, intended by the parties to take immediate and full effect, and was acted on accordingly; though an executory contract was, at the same time, entered into, for the future sale of the stock to the railroad company, at the option of the township. Without determining whether, for any reason, this stipulation was invalid, it is enough to say, that if entered into bona fide, through a mistake of power, and if it was a substantial 'inducement to subscription, its invalidity might give the township a right to rescind the contract of subscription, and recover back the amount paid for the stock. But this, we think, would be the extent of the effect, which could on’y reach the contracting parties. 16 B. Monroe, 358; Weedon v. Lake Erie, & Mad River R. R. Co., 14 Ohio Rep. 563. Such would doubtless be the case, if the stock subscriber were a natural person, and *584 we see no reason why it should be otherwise here, for the power to subscribe is conferred on the trustees in express and general terms, carrying with it all the discretion necessary for the prudent and proper execution of the power, and qualified only by the limitation as to amount, and the requirement of a previous vote.
As to the objection resting on the want of conformity between the terms of the bonds as issued, and the terms proposed in the notice of election, we have already said enough to indicate that, in our judgment, this objection does not go to the question of power, but rather to that of good faith. This nonconformity, if substantial and to the prejudice of the township, would, at the proper time, have been a good cause for enjoining the trustees from executing and negotiating the bonds in question. But whether, after years of acquiescence by all parties interested, it is good ground of objection as against other parties who have relied and acted upon that acquiescence, is a very different question.
But it is further objected that the trustees had no power to issue these bonds in payment of their subscription, that while they were authorized to borrow money for that purpose, this was not a borrowing of money.
Statutes must be construed reasonably, and with reference to the known usages and modes of transacting business. A power to borrow money for any particular purpose, implies the power to execute and deliver the proper evidences of indebtedness, which the usages of business demand, in transactions of that kind. Here, the power was given to a corporate body, to borrow money for an unlimited time, as a means of providing for the payment of a subscription for railroad stock, and no particular mode of evidencing the indebtedness to be created having been prescribed, it must be presumed that the legislature intended the transaction to be consummated according to the common usage in such cases. Nor can it be denied that the usual mode of borrowing money in such a case, is by the issue and sale of the bonds of the corporate body borrowing. In this case, the bonds of the township, bearing a rate cf interest no greater than was authorized, were issued in pay *585 ment of a subscription for an equal amount of stock, and this Was the substance of the transaction contemplated and authorized by the statute.
Nor do we perceive any substantial reason why the bonds could not be delivered to, and received by the company, in payment for the stock subscribed. They were received by the company in payment, at par; and it does not appear that their market value was less; and they were negotiated by the company to contractors, in discharge of an equal amount of indebtedness arising in the construction of the road. In'a case precisely similar, before the supreme court of Pennsylvania, the objection that the issuing of bonds in payment for a subscription of stock, was not a borrowing of money, was regarded by the court as a mere quibble on words. Comm. ex rel. Middleton v. Commissioners of Alleghany Co., 1 Wright’s Rep. (37 Penn. St. R.) 237. And, in this court, it has been held, that under an authority given to a railroad company to sell and negotiate its bonds, an exchange of such bonds for railroad iron might properly be made. Coe v. C. P. & I. R. R. Co., 10 Ohio St. Rep. 372. It was said by the court in that case, “Practically, the only objection to receiving for the bonds property needed by the company, instead of money, would be that it might be a device to dispose of the bonds at less than their par value. If, in fact, the par value of the bonds was received, it could make no conceivable difference whether it was in money or in money’s worth. . . And when we clearly see what was the intention of the legislature, we are not bound to give to the language an interpretation that would be strained or unreasonable.” Applying this principle, we think the objection under consideration is without substantial foundation.
It is further claimed, that under the state of facts shown by the answer, the reservation appended to the bonds, of the contingent right, on the part of the township, to require the railroad company to take the stock subscribed, and redeem the bonds issued by the township, may be enforced, as a condition of the bonds, though in the hands of an assignee and bolder for full value.
*586 The same point was made, and the assent of this court thereto refused, in the case between these same parties, reported in 12 Ohio St. Rep. 624. By the terms of the bonds, the township became bound for their payment, not only to the company, but also to the assignees. But the reservation appended, was a contract between the township and the company alone. It was no part of the contract with the assignees. It was clearly intended that the assignee and holder of the bonds should be paid, in any event; but that in the contingency mentioned, the trustees should have the right to require the payment to be made by the company. The assignee is not made a party to this arrangement; and to suppose that the parties intended otherwise, Avould be to suppose that they intended the value pf the bonds should depend on the credit and solvency of the company alone. This would defeat the Avhole object and policy of the law authorizing the subscription to be made, and which contemplated substantial aid in the construction of the work. It would place the bonds on the footing of mere company bonds, Avould impair their value, and greatly interfere Avith their ready negotiation. No fair construction of the language employed, nor consideration of the circumstances attending the transaction, can make this defense available, as against the relator, who occupies the position of an assignee. And though the bonds, on their face, conveyed notice of this stipulation between the township and the company, yet the rights of the assignee are not affected thereby, for the question of notice can have no place here. The assignee can not, by notice, be made to occupy the same ground with the payee, for the terms of the contract are otherwise, and define the distinct rights of each.
Of any of the irregularities or defective proceedings set up in the answer, and not apparent on the face of the bonds, there is no evidence that the relator had notice when the bonds in question Avero assigned to him, and he claims to be a Iona fide purchaser without notice. But were it otherwise, and had he been fully informed of all the alleged informalities, irregularities, and grounds of objection stated in the answer, would his right to the relief which he asks be affected thereby ?
*587 If the bonds were absolutely void for want of power to issue them, notice could not render them more so. But if, by reason of irregularities, they were voidable only, then the effect of notice would depend upon circumstances. There is no evidence in the case which would justify the inqputation of actual bad faith, either to the trustees by whom these bonds were issued; to the railroad company, or its officers, to whom they were delivered ; or to the relator to whom they have passed by assignment. All the parties are, unquestionably, bound by the obligations which good faith imposes. How then stands the case? The electors of Groshen township were notified to vote upon the question of subscription. The notice of the election specified certain terms upon which the subscription would be made if authorized. The president of the railroad company was aware of these terms, and in good faith advised in their favor. By a decided majority vote, the township determined in favor of subscription; and the trustees accordingly subscribed the amount voted for and issued bonds. But in so doing, the terms .were varied, by omitting one condition, which, perhaps, was justly supposed to be illegal, and, by extending the time for the payment of the bonds. This change, it is but fair to presume, was made honestly, with a view to further the interests of the township and render the bonds available. It was done openly, and the terms adopted were spread out on the face of the bonds. Whatever exception the people of Groshen township might have then taken to this action, it is certain they took none. Desiring the road to be constructed through their township, they stood by, and permitted the subscription to be thus made, and bonds to be issued and negotiated accordingly ; and for, at least, four years afterward, they annually levied and collected taxes from which the interest on the bonds was, from year to year, promptly met and paid, without protest, remonstrance, or complaint. But, at the end of this time, the road having been constructed and its incidental benefits secured to the township, the company is found to be embarrassed, and its stock, perhaps, worthless. -Thereupon another payment of interest was still made, but, under protest. And now it is asked that these grounds of exception (long since waived), to *588 the acts of their own. agents which they might possibly have avoided, by prompt action, but which they have so long acquiesced in, and so repeatedly ratified, may be set up to defeat the bonds thus issued, for their benefit, and at their instance, in the hands of an assignee, for full value, who has relied upon this long-continued acquiescence, and these repeated acts of ratification. We think it is a strong and clear case for the application of the doctrine "of estoppel. The claims of good faith and common honesty are as obligatory upon corporations, and communities, as upon individual natural persons. And that they may be thus estopped, is not- an open question in this state. Garrett v. Van Horn, 7 Ohio St. Rep. 327; Smead v. Union Township, 8 Ohio St. Rep. 394; Goshen Township v. Shoemaker, 12 Ohio St. Rep. 624. We think such acts of acquiescence will estop the township from objecting to the validity of the bonds for any irregularities short of such an absence of power, or such illegality, as would render them absolutely void. And that notice of such irregularities will not defeat the estoppel.
Peremptory mandamus awarded.
Brinkerhoee, C.J., and Wilder and White, JJ., concurred.
Ranney, J., dissented.